Our next case this morning is Pacific Gas & Electric v. United States. Is it time to open the bank or is it too strong? I guess she has to be strong. I think she has to be strong. Okay. Make sure you get the power of the chair. I want the people to handle you. Your chair needs to be brought. Okay. I'm sorry. It's not going to get up. Well, it should. I guess it's too strong. I'm on fire. Okay. Mr. Lester. May it please the Court. Your Honor, this case, as the Court is aware, is a second appeal following a remand from this Court in the original PG&E, following the original trial court decision in PG&E. There are three narrow issues here before the Court, the first of which would moot the second two. The first issue that the Court would decide is whether the trial court properly evaluated damages claims for private fuel storage and an increased damages award based on an exchanges model pursuant to the mandate rule. The mandate rule, as the Court is aware— But we, the Federal Circuit, in our last visitation on this case, changed all the rules. We set things back to 87. Wouldn't that change of the standard open more issues up? Well, certainly those things with this Court identified a problem in the Court's causation analysis. It actually affirmed the manner in which the Court conducted a but-for world evaluation causation analysis by saying that it approved of the way the trial court had identified the but-for world and then identified the actual cost and compared the two. But it found that the rate was improper. But the appeal here, contrary to the appellant's brief, was not simply a kitchen sink appeal that appealed every single issue that was decided below. And these two particular issues either were not appealed or were decided by this Court. But the Court didn't ignore the scope of the remand. The Court considered in detail the nature of the mandate and concluded that these issues were opened up by the change of the date to 1987. Well, let me discuss first the private fuel storage, or PFS, issue. I mean, there the Court had found at the first trial that PFS was not caused by the delay applying the 91 rate. But it also found that the costs, the types of costs there for an off-site sort of centralized storage facility was not foreseeable at the time of contract award. That decision was in a separate paragraph from the causation analysis and was unrelated to the specific rate of acceptance. And, in fact, it would have to be because at the time of contract formation, which is when we look at foreseeability, there was no rate of acceptance because the rate at the time of contract formation was going to be decided later, would be determined later. And as this Court found in its analysis, it's applying an 87 rate, which is five years after the 83 contract was entered. So the Court made a foreseeability finding, which was not appealed. Now, certainly the plaintiff could have appealed it, but it elected not to do so. On remand, the Court, for reasons we don't really explain, just went back and made an assertion that, oh, you know, these costs are now foreseeable. But even on the merits of that, the problem with that is that she cited absolutely nothing to support the foreseeability finding. And as this Court in Old Stone and Citizens Federal has held, you can't simply assume foreseeability. There must be factual evidence to support it. Assumptions are not sufficient. But that gets to the merits of it. I mean, the finding was made originally. JUSTICE SCALIA. Staying with the mandate rule a second, doesn't the mandate rule give the trial judge some discretion to weigh the circumstances and where justice requires to reopen things? MR. LIEBERMAN. Well, under Tronzo, there is an exceptional circumstances exception. However, I will first point out the plaintiff didn't raise that below. The Court didn't consider it or make an exceptional circumstances finding. And the appellant's brief, although it identifies it in a sentence in footnote 10 of its brief, also didn't raise exceptional circumstances here because it provided, as required by this Court's decision in Smith-Kline, any kind of detailed argumentation about exceptional circumstances. JUSTICE SCALIA. You're not arguing you didn't get a chance to make every argument. You're not arguing you were surprised or somehow prejudiced by this. You're just saying you're asking kind of for a technical application of the mandate rule. MR. LIEBERMAN. Well, we responded to the arguments that were raised below. We certainly raised the mandate rule issue below, and we responded to the arguments that were made. JUSTICE SCALIA. But you were deprived of any opportunity to make your arguments. MR. LIEBERMAN. No, but certainly the purpose of the mandate rule is to, you know, provide a finality to the first decision to the extent it wasn't appealed. You know, the whole purpose is to, you know, a litigant is entitled to finality on issues that aren't appealed. JUSTICE SCALIA. You're basically arguing that, if I understand you, that the PFS project is not, was decided in the first appeal. MR. LIEBERMAN. It was, Your Honor. And that that was not an issue that remained open, and there was nothing in our mandate that left it open. With regard to the foreseeability findings and the speculativeness findings, those were unrelated to the rate issue or the causation analysis. Certainly, causation was another part of PFS, but the other findings that went into, under which the Court declined to award PFS in the first trial were not appealed, and there was no basis under the mandate rule for revisiting those below. JUSTICE SCALIA. So, absent on their part, you're saying, absent a motion for en banc or certiorari, there was nothing left to be dealt with on that issue. Is that your argument? MR. LIEBERMAN. Well, I mean, on the first appeal, they could have appealed that issue, PFS, and they didn't. There's no mention of PFS anywhere in the brief in the first appeal because it wasn't an issue. It wasn't an issue before the Court, certainly not the foreseeability or speculativeness findings. So with regard, also then the exchanges issue, this is certainly a closer call than the PFS issue. But if you look at pages, Joint Appendix page 218, which is the trial court's first opinion, there is 218 and 241. The decision with regard to exchanges, to deny exchanges, was based on speculativeness of the evidence, not upon the specific rate of acceptance. The appellant here actually did appeal exchanges, but it only appealed the trial court's exclusion of their expert witness. It did not appeal the actual denial of exchanges on the merits. And this Court affirmed the exclusion of Mr. Graves. But I would like, since I have very short time, actually to talk about also the problems with the exchanges model because this is an issue that is coming up a lot in the cases. Mr. Graves is testifying in many nuclear fuel cases using the same model that has the same defects. Now, here we're only talking about a one-year move-up, but in many other cases, such as at Dairyland, he's moving people up 8 years, 9 years in another case, 10 years in 3 other cases, 12 years in yet another case. And it's all based on a model in which Mr. Graves assumes, and he assumes, not based on— It's going to be a market created to move things back and forth, but isn't that pretty logical? We're not denying that— In a Black 4 world, wouldn't that have indeed occurred? We're not denying that exchanges could occur, and exchanges probably would have occurred. The issue with this model is that it identifies that they would occur in a specific way so that the specific plaintiffs would have these accelerations so that they would move way up in the queue. They would have exchanged with unidentified utilities to move up. Now, for that to happen under the contract scheme, some utilities would have to move back in the queue. Mr. Graves' model doesn't move anybody back. People move up because he never identifies who the trading partners would be or who the potential trading partners would be. So the result is then everybody moves up, or for those people who don't rely on exchanges in their cases, they stay where they are, but nobody ever moves back, in effect accelerating the acceptance rate that this court identified in Yankee because some people just get to move to the front of the queue based on a model that isn't based on any kind of real evidence. Is he doing that to get everything within the 6-year statute of limitations? I'm seeing kind of a theme that every 6 years we get a big group of these cases because every 6 years they have to sue again. Well, that's true. Of course, we're trying to settle all these. Because you haven't solved the problem. But doesn't that, I mean, I'm saying this a bit facetiously, but I'm wondering if that doesn't affect the Graves' analysis. He has to somehow fit things within a statutory period. In our brief, well, he's not looking just at statutory periods. He's looking years down the future. His model just looks into the future. It just sort of puts in all the allocations and comes up with the conclusion this person moves up. But we don't know who moved back. And as we know, one of the problems with his model, he assumes perfect competition. Have you asked him that question in Cross? You bet. Who moved back? What's his answer? His model doesn't really do that. In its approximation, it is, as he says on Joint Appendix page 1528, this is essentially a model and framework for exchanges as he would see they might happen. Not that this is how they would have happened. He doesn't talk to any, a single utility to determine whether they would be willing to go into the market. And yet he assumes 100 percent participation by utilities, even though we presented evidence from one utility, WebCo, that's where they testified, no, even if DOE had timely performed, we wouldn't have engaged in exchanges, wouldn't give up our SKU because our state regulatory board wouldn't like it. And if we did something wrong, they would hose us. But if we did something right, we wouldn't get any benefit because we'd all go to the rate payers. So why would we engage in something like that? Even PG&E acknowledged there was evidence that they had an agreement at the Humboldt Bay plant that they wouldn't go back in the SKU because they had an agreement with investor groups that they wouldn't do that. They would only move forward. It's a very good case for the speculative nature of that whole operation. Sure. On the other hand, on the other hand, what deference do we owe to the trial court who has to deal with all of that? And as we know, damages are not an exact science. There's an approximation in any damages report. Why isn't that within the range of reasonable approximation as the trial court saw it? Two responses, Your Honor. First, in the Locke decision, which the plaintiff cites, we talked about approximation of damages. Locke goes both ways. Right. Here, though, we're talking about actually approximation of causation for the first year of acceptance. We're not challenging that there were damages from 2000 onward. The issue is whether, oh, were there damages, was Dewey obligated to accept fuel the first year from this plaintiff? That's a causation analysis. I'm not aware of any decisions that say we can just approximate causation. Second, this Court's decisions in Shockley and Oinous are very instructive, both cited in our brief, about these types of models. There we were dealing with lost profit models in patent infringement cases, but the principles there are the same. The expert simply relies on assumptions rather than actual factual evidence. The expert's opinions have to be supported by actual facts and not simply assumptions of, oh, every utility would engage in the market even though I didn't talk to any of them. These are the problems with this type of model that is simply based on assumptions and speculation. And it's especially difficult here where we have a universe of 74 lawsuits that have been filed in the Court of Federal Claims where everybody is suing for damages based on the government's breach. Not a single one of those plaintiffs is saying that they would move back in the queue. So the government is paying all these folks either for their allocations they have or moving forward in the queue. But under the contract, that's never what would have happened. If somebody moved forward, someone would have to move back. This analysis doesn't identify and provides no basis for analyzing or identifying who those folks would be, so those cases could be adjusted in terms of those plaintiffs moving back in the queue. Mr. Lester, I heard one of these same cases yesterday. Yes, Your Honor. And I'm aware of all the cases that are in the queue on this whole range of things, and I believe our chief judge heard one of these a month ago or so or several of them again. What is the government's intention with these cases? Are you going to litigate these for the next 200 years? Is that the plan, or do you have some other solution? Your Honor, there's no—I don't think there's any secret that the government has been working very hard to try to settle these cases with utilities. And I think with this court, Scott, there is a massive effort to do that that is ongoing. You know, we can't open Yucca Mountain up in a facility here at the Department of Justice, but we can try to take these cases out of court and create an administrative scheme to deal with them. With this court's help and some guidance with court decisions here, that might resolve some issues. That's what we're hoping to do. Have you considered turning your building over there into a storage facility? I don't think it's big enough, Your Honor. I'd like to reserve the rest of my time for it. Mr. Lester will restore your full time, and would you give Mr. Phillips an additional four minutes if he needs to use it, and that will keep everything even. Thank you, Your Honor. One second while we get the time, Mr. Phillips. I appreciate that, Your Honor. You may proceed. Mr. Phillips, would you follow the same pattern, please? And let's take up the PFS project first. Could we do that? Oh, absolutely. And I suppose you want me to start with the mandate issue and then deal with the findings of the district court? I went back and looked at your brief in the original case in this matter, and you saved two issues on appeal, right? Right. The first one was beautifully phrased because I don't know what it means. I won't take that as a compliment. Whether the CFC's construction of the contract, et cetera, et cetera, is wrong as a matter of law. Well, I think by sorting through the words in there, what you really were talking about was the ACR problem. Isn't that right? That's absolutely correct. And then your second statement, issue statement, was the exchanges. That's correct. I didn't see anything in your statement of issues on appeal that had anything to do with the PFS project. Our fundamental point with respect to the allocations. First of all, am I right about that? Well, there's nothing separately in the question presented dealing with PFS, but what we did say in the question presented is that the entire methodology that the district court or the court of federal claims had used in this case was fundamentally and fatally flawed by teeing everything off of the 1991 allocations. And then if you go back to 1987, and what we said specifically is if you do that, all of PG&E's reasonable costs for planning and maintaining additional storage post-January 98 are properly chargeable to the government as contract damages. Once this court corrects the legal errors that infect the CFC's contract interpretation, PG&E's damages must be recalculated. And then we specifically identify. But the legal error that you cited were two things. The ACR date problem. Right. And the exchanges problem. Absolutely. Neither of which bear on the PFS project. No, but the. . . As I understand it. . . And it also didn't deal with. . . Am I misunderstanding you? Yes, I think so, Judge Plager, because what we were saying is that this was such a fundamental and fatal defense. It's essentially like a determination that liability. You shouldn't have imposed liability or that there was error in deciding liability. Inherently, if you say that the liability gets set aside, the damages get set aside as well. And that's exactly what we were saying, is that there was no basis for a determination. . . The court was completely misguided as to the breach of the contract. And therefore, the damages that would flow from the breach necessarily have to change. And there, then the question is, do we have to separately argue, given that the key is causation? Do we have to separately make an argument with respect to causation? If we're saying that the fundamental basis on which the Court of Federal Claims said there is a cause to these storage costs. . . And there is a cause to the Humboldt Bay arrangement and the exchanges as well. And the answer to that is no. What we're saying is that if you readjust the allocation date back four years. . . What you will say is that it was completely foreseeable because these damages, the payments made. . . And let's understand, these are actual payments made for this opportunity to write a first refusal. . . Against the backdrop of what this Court said the last time around was knowing to a moral certainty. . . That the government was not going to comply with its contract at that point in time. And that's the basis on which the Court said, well, no, it wasn't foreseeable under those circumstances. . . Because we were talking about damages that were completely not caused by the government's breach. And so the Court of Federal Claims basically tied the two together in that original opinion. And this Court's mandate was specific. It said, this Court offers the Court of Federal Claims on remand the opportunity to recalculate damages. . . Based on the 1987 acceptance rate. And what our argument had been, as I just read it to you, was all of the damages have to be recalculated. So it goes back down to the judge and she examines, you know, did it affect my assessment . . . With respect to the payments for the private fuels arrangement. And she said, yes, it completely changed my view. I had made a decision that there was no cause because they expected that the contract was going to be complied with. I completely am wrong about that. And then with respect to the exchanges, she said, absolutely clear that the exchanges were going to take place. That's, you know, essentially conceded here. I'm not bringing this as a class action, Your Honors. I'm just concerned right now for P, G, and E. And this is essentially a binary decision that's got to be made. We're, you know, under these circumstances where you're talking about less than 16 million tons of fuel. And 1,200 tons total allocations. And 700, more than 750 tons held by parties that don't have any particular need. Under those circumstances, you don't need to worry about how specific this model is or how far you can take it out or any of the concerns the government raised here. The question is, would any rational person not spend $700,000 to save $5 million in costs? And if we did it that way, the government would be in here screaming at us that we didn't act prudently by not spending that money in order to protect it from those costs. You make a good point that you're only representing your client. But don't we have to consider Mr. Lester's point that the model that Dr. Graves is using may be wrong if he doesn't have some people moving back in the queue to accommodate those who move forward? Well, he clearly has some people moving back in the queue. What he doesn't do is precisely identify them. But I guarantee you that as the government litigates those cases, it's going to make the same judgment that the experts makes in this context, which is, did you have any reason? Did you have excess capacity for storage? If you did, then you have every reason in the world to move back in the queue. And they're going to argue that that would be the reasonable action that you would take. Again, remember, we're dealing in a world of mitigation. Our duty to mitigate arises under this Court's decision in 1988. Do you have any evidence of record of those companies who did have excess storage and would have moved back? No, we didn't ask them. Because at that stage, this was a completely hypothetical situation. That's the problem. It's so hypothetical because I cannot imagine somebody sitting there on all that fuel and saying, oh, yeah, I'd like to keep it for a while. No, no, no, but Judge Plager, if I've got a big pool that can accommodate 10 years more and it's just sitting there, and somebody shows up and says, look, if I can give you this much to sit in your pool, I will pay you $700,000 to do that, and I'll switch with you. You can have my allocation next year when you want to take some in a more reasonable lump anyway. I mean, it would be irrational on both sides for the parties not to make that exchange under those circumstances. That is precisely what the Court of Federal Claims decided in this particular case. Well, if that's so true, why didn't you get evidence to that effect? Well, because what we did, I mean, why didn't we go ask these people whether in a hypothetical world they would have done that? Womack said people would do that. That's the way that exchanges would operate. And even their witness testified that he expected that there would be exchanges. And if there is an exchange, somebody has to move back. That's the nature of an exchange, right? Has there ever yet been an exchange? Well, no, because the government breached the contract and eliminated any basis on which we would have set up these exchanges. But again, it seems to me this Court doesn't have to worry about how broadly this particular model is going to operate. All this Court has to say to itself is did the Court of Federal Claims make a reasoned determination that when you're talking about 750 million tons of available capacity and 16 million tons that needs to get moved that that isn't exactly what a party would do and that in fact it would have been crazy for us not to do that and it would be equally crazy for somebody else not to do that and to do it with a $700,000 price tag. I think frankly they'd have probably made that trade for free simply because there's not much going one way or the other and these are groups that are known to interact a great deal anyway. But we didn't contest that part of it. We pay $700,000 for the right to move our spent fuel into their facilities. That's what the Court found. That finding is unassailable in my judgment. It was the Court asked for it. This Court asked the Court to recalculate those damages. She did it according to that. The Court candidly should affirm. So no further questions, Your Honors. Thank you. Thank you, Mr. Phillips. Mr. Lester, we gave you your full time, five minutes. You may proceed. I'll try to be very brief, Your Honor. Just responding to the specific points that were made. With regard to the foreseeability issue, clearly foreseeability, this Court's aware, is looked at at the time of contract award. For foreseeability and causation, does this Court recognize any admission or separate requirements? There's no explanation, either in the Court's decision or here today, why the rate somehow affected foreseeability at the time of contract formation when the parties wouldn't have even known what the rate was. So with regard to that, we believe the mandate rule should preclude recovery of PFS. And with regard to the exchanges model, and responding to the Court's question, there's never been a single utility who has ever claimed that they were going to move back in the queue or that they had some kind of excess capacity that they were going to give up to somebody else. And if you look at Joint Appendix pages 1655, 1656, and 1658, there's an explanation in the testimony there about why that's a problem, why people wouldn't want to do it. First, there's so much political opposition. People get protested by local residents, by intervener groups, by politicians who are always fighting about a very touchy subject, nuclear waste and its disposal. People don't like it, they don't want it around, and people are very frightened. But it's already around. It's around. The pool is there and it's bubbling. The question is, since we've got the pool and it's bubbling, should we bring an extra couple billion dollars into our state to help ensure the safety of that bubbling pool by taking it from another state? That's kind of the question. Actually, the issue would be whether this utility would sell its rights and agree to keep its fuel on its site for a lot longer than it otherwise would have to, and would the neighbors next door be okay with that? Would they want it to be there longer? And as the testimony I just cited talks about, there's a lot of... There were lots of buckaroos to reinforce the pool and make sure that it was safe. Sure. But what I'm talking about is factors that would be considered. Mr. Graves' model simply assumes the opposite. And the problem with the model is, just like what I'm saying, these are assumptions. If we didn't talk to anybody, there's no evidence. Mr. Graves' model assumes exactly what the government created in the standard contract. In your standard contract, you provide for these exchanges. So you must have assumed at some point, or whoever did all this, must have assumed at some point, did you not, that somehow these exchanges will occur? We are not disputing that the exchanges provision contemplates, and it is likely that there would be some exchanges somewhere. The issue here is, would they be the way that Mr. Graves' model represents to let these particular plaintiffs get out early and these other plaintiffs get out early without even identifying the potential? Did you come up with a better model? No. No, we didn't. I mean, it's the plaintiff's obligation here. They're wanting to move up in the queue. We went with a straight-off schedule because we don't have a basis, given that the trial court declined our request to consolidate the cases for the purposes of deciding this allocations issue on a uniform basis, and then to go back to the trial court judges individually in each case to then identify the damages based on these allocations. All the plaintiffs screamed about that and didn't want that. They wanted to be separate. So now we have no basis to move some forward and move some back as a consolidated proceeding would have permitted. Instead, we have to look in each individual case. Plaintiffs are not going to willingly say, oh, yeah, we would have traded and moved back eight years so we get eight years less damages. In our case, nobody is doing that. We're paying everybody based on either off or these efforts to move forward. Is it your position that at this juncture no model can be developed that will provide for these kinds of damages? No, we're not saying that, Your Honor.  for example, going and talking to utilities, identifying utilities that would have been likely to move back, identifying who did have the excess capacity. Why would they move? Did they have agreements in place like PG&E and Humboldt Bay had in place that wouldn't allow them to move back? Would they be able to do that? That type of sufficient factual support. Could they depose the government to find out what you had in mind when you put the provision in the contract? Sure.  the utilities actually wrote this provision and provided it to the government. So it was included in the utilities request. But like in Shockley and Oinous, we're not saying that you can never, ever have a model that would meet identifying appropriate exchanges or identify exchanges that would have occurred and form the basis for an increased damages award because of that. We are saying that in this model where the expert doesn't talk to anybody, makes all kinds of assumptions that are just based on his own beliefs without any factual support, is not sufficient to increase damages here by almost $5 million and in other cases by even more than that. We would ask the court to reverse on these two points. Thank you, Your Honor. Thank you, Mr. Lester.